**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**


**REV. TOM BROWN**                                                                            **PLAINTIFF**

**v.**                                            **Case No. 5:15-CV-05213**

**ARKANSAS DEPARTMENT OF**
**FINANCE AND ADMINISTRATION and**
**LORETTA TURNER, Northwest Arkansas District Manager**
**for the Revenue Division of the Arkansas Department**
**of Finance and Administration**                                               **DEFENDANTS**


<u>**MEMORANDUM OPINION AND ORDER**</u>

Now before the Court are the parties' cross-Motions for Summary Judgment: one filed by Defendants Arkansas Department of Finance and Administration ("DFA") and Loretta Turner, who is the Northwest Arkansas District Manager for the Revenue Division of the Arkansas Department of Finance and Administration (Doc. 19), and one filed by Plaintiff Rev. Tom Brown (Doc. 47). Once the Motions were fully briefed and ripe for decision, the Court held a hearing on the Motions on April 7, 2016, at which time the parties presented oral argument and responded to questions posed by the Court. The Court then ruled from the bench that, as the parties agreed that no genuine, material issues of fact were in dispute, and the case may be decided as a matter of law, Defendants' Motion for Summary Judgment (Doc. 19) should be **GRANTED**, and Rev. Brown's Motion for Summary Judgment (Doc. 47) should be **DENIED**. The following Order sets forth in greater detail the reasons for the Court's decision in favor of Defendants on

1

summary judgment.  To the extent anything in this Order differs from what was announced from the bench, this Order will control.

## I.  BACKGROUND

Rev. Brown filed his Complaint *pro se* on September 4, 2015 (Doc. 1), along with a Motion for Temporary Restraining Order (Doc. 3) and Motion for Immediate Emergency Hearing (Doc. 4).  What prompted Rev. Brown to seek the Court's assistance that day was an incident that occurred the previous day, September 3, 2015, at the Fayetteville office of the Revenue Division of the Arkansas Department of Finance and Administration, located at 965 South Razorback Road ("Revenue Office").  According to Rev. Brown—who is a Rastafarian minister who states he uses marijuana as part of his faith's religious activities[1]—he was present at the   Revenue Office soliciting signatures for a statewide ballot initiative called "The Arkansas Medical Cannabis Act."   Rev. Brown had been soliciting signatures for this ballot initiative since March of 2014, doing so from a table set up under a pear tree, in a grassy area located several feet from the front door of the Revenue Office and at the edge of the Revenue Office parking lot.  *See* Doc. 60-3, pp. 5-9 (Brown Dep.).  Rev. Brown ordinarily stationed himself in this spot during the Revenue Office's normal business hours in order to talk with patrons of the Revenue Office and persuade them to sign the ballot initiative.

At some point in the afternoon on September 3rd, Defendant Loretta Turner, the District Manager of the Revenue Office, confronted Rev. Brown and informed him that the DFA had recently established a no-solicitation policy at its revenue offices, and that he

---

[1]  *See* Doc. 44, Affidavit on Holy Anointing Oil Booklet and Exhibit of Same.

would have to leave.[2]  *See* Doc. 19-1 (Turner Aff.); Doc. 4-1 (Brown Aff.).  Rev. Brown refused to leave, citing his First Amendment right to solicit ballot initiative signatures, at which point local police were called to the scene.  When the police arrived, they informed Rev. Brown that if he did not cease his solicitation of signatures and leave the premises, he would be arrested.  The officers provided him with an incident report at his request, and only then did Rev. Brown pack up his materials and leave.

Rev. Brown believed he was entitled to an emergency hearing on the issue of whether he could be lawfully banned from collecting signatures at the Revenue Office because, in his view, time was of the essence in collecting signatures for the ballot initiative.  He claimed that he had been given a deadline of July 1, 2016, to submit 100,000 signatures for the ballot initiative, and the Revenue Office was a prime, "invaluable" spot to collect the necessary signatures, as it was a place where county residents reported in order to renew drivers' licenses and vehicle registrations and pay fees and taxes.  (Doc. 4-1, pp. 2-3).

A few days after the Motions for Temporary Restraining Order and for Emergency Hearing were filed, the Court entered an Order (Doc. 10) denying the latter.  In doing so, the Court also found that Rev. Brown had failed to establish that he would suffer immediate and irreparable injury unless the Court issued a restraining order *ex parte*, in light of the fact that the signatures he needed to collect were, by his own admission, due ten months later, and he was not prohibited from collecting signatures in general, at other locations. The Court then converted Rev. Brown's Motion for Temporary Restraining Order into a

---

[2]  At the summary judgment hearing, Rev. Brown mentioned that Ms. Turner had asked him to leave the Revenue Office on two previous occasions, but he had refused.

Motion for Preliminary Injunction and ordered Defendants to respond to the Motion within 21 days of receiving service of process.

In response to the Court's Order, Defendants collectively filed an Answer (Doc. 17), a Response to the Motion for Preliminary Injunction (Doc. 18), and a Motion for Summary Judgment (Doc. 19), along with a Brief in Support (Doc. 20), and Statement of Facts (Doc. 21). The Court then issued an Initial Scheduling Order (Doc. 22) and set a case management hearing for November 10, 2015. For his part, Rev. Brown hired an attorney who entered his appearance in the case on October 15, 2015, and successfully moved the Court to continue the case management hearing and grant him additional time to respond to Defendants' Motion for Summary Judgment. Rev. Brown's Response in Opposition to the Motion for Summary Judgment (Docs. 29, 30) was ultimately filed on November 16, 2015, and a separate Pretrial Memorandum (Doc. 34) was filed on December 3, 2015, the day of the case management hearing.

Rev. Brown became dissatisfied with his counsel's representation and made an oral motion at the case management hearing to represent himself *pro se*. The Court deferred ruling on the motion and instead conducted the hearing with counsel present. The Court determined that Defendants' Motion for Summary Judgment was premature in light of the fact that the parties had not engaged in any discovery, and the Court was well persuaded by Rev. Brown's counsel that a short period of expedited discovery was in order before the parties would be prepared to argue both the Motion for Summary Judgment and the Motion for Preliminary Injunction. Accordingly, the Court set hearings on these two Motions, as well as an expedited discovery deadline and supplementary briefing schedule.

4

The rift between Rev. Brown and his counsel was never repaired following the case management hearing, and on December 9, 2015, Rev. Brown's counsel withdrew from the case at Rev. Brown's request.  *See* Doc. 41.  Rev. Brown once again represented himself *pro se*, and almost immediately filed a second Response to Defendants' Motion for Summary Judgment (Doc. 42), which contained an argument styled as a "Counterclaim for Summary Judgment."

Upon receiving Rev. Brown's second Response, Defendants requested clarification as to how to treat the Counterclaim for Summary Judgment, and the Court entered a text-only Order on December 21, 2015, stating that it intended to treat Rev. Brown's second Response to the Motion for Summary Judgment as a supplement to the original Response his attorney filed on November 16, 2015 (Doc. 29), and Rev. Brown's Counterclaim for Summary Judgment as an affirmative cross-Motion for Summary Judgment.

To further confuse the procedural posture of the case, Rev. Brown filed a separate Motion for Summary Judgment (Doc. 47) on December 22, 2015, prior to taking any discovery in the case, and despite the fact that the Court had determined that a brief period of discovery might be helpful to the parties in clarifying the facts on summary judgment. Rev. Brown's Motion for Summary Judgment indicates that he disagreed with his former counsel as to the need for discovery in the case, as all the relevant facts necessary to grant him summary judgment were already documented in the record and not materially in dispute.[3]

---

[3] The only caveat to this was Rev. Brown's contention—made consistently and repeatedly throughout this litigation—that some of the police reports Defendants appended to their Motion for Summary Judgment concerned individuals other than Rev. Brown.  It appears that after taking some discovery, Defendants now agree with Rev. Brown that 8 of the 22 police

The legal claims at issue in this lawsuit, which are now before the Court on summary judgment, include the following: (1) alleged violations of Rev. Brown's constitutional rights, which specifically include his First Amendment right, as applied to the State through the Fourteenth Amendment, to freedom of speech and to petition the government;[4]

---

reports originally attached to their Motion for Summary Judgment had nothing to do with Rev. Brown. Recognizing this error, Defendants filed an amended affidavit in support of their Motion for Summary Judgment, along with the correct police reports, on April 5, 2016, just days prior to the summary judgment hearing. *See* Doc. 68. According to Sergeant Craig Stout's amended affidavit, "incorrect information was inadvertently contained in the search results" when Defendants filed their Motion for Summary Judgment. *Id.* It is now clear that those initial search results captured complaints about other individuals who were collecting signatures for ballot initiatives at the Revenue Office. *Id.* In particular, only 14 out of the original 22 complaints mentioned Rev. Brown by name. *Cf.* Doc. 18-3 (Stout Original Aff.). More to the point, the Court's review of these 14 complaints confirms Rev. Brown's assertion that patrons of the Revenue Office never reported to the police that Rev. Brown had committed or threatened to commit any act of violence. *See* Doc. 68-2. Instead, patrons' complaints were about Rev. Brown's verbal harassment, name-calling, yelling, arguing, and generally annoying behavior as he attempted to persuade patrons to sign his ballot initiative. *Id.* Rev. Brown admits that the task of collecting signatures can at times be "not . . . pleasant." *See* Doc. 60-3, p. 7 (Brown Dep.) ("Because you've got the chance to talk to these people coming across the parking lot . . . you're trying to get their attention . . . . They're not necessarily thinking about anything else and it's not a pleasant task usually and so they're, you know, in a rush and don't bother me, et cetera, et cetera. So whatever device can be used to get their attention and bring you—bring them into your area of influence benefits. That's why I get so many signatures because I know how to do this.").

[4] Rev. Brown also purports to bring a free exercise claim under the First Amendment, but fails to provide the Court with any facts that would support such a claim. In particular, his pleadings indicate that he believes Defendants' ban on solicitation negatively impacts his ability to tell others about his Rastafarian religion—something he claims he often does when trying to convince people to sign the ballot initiative on medical marijuana usage. The Court finds that the solicitation ban does not, in fact, prevent Rev. Brown from talking with patrons at the Revenue Office—or anywhere else, for that matter—about his religious faith. In addition, Rev. Brown asserts that if he and others succeed in the ballot initiative effort, this in turn may lead to Arkansans voting in favor of legalizing marijuana for medical purposes, which in turn may lead to the legalization of marijuana in general, so Rev. Brown could freely use it in his religious ceremonies without fear of being in violation of the law in doing so. This "what if" chain of events is far too speculative to result in a conclusion that prohibiting Rev. Brown from collecting signatures for the ballot initiative at the Revenue Office will result in a significant burden on his ability to freely exercise his religion. The Free Exercise Clause

(2) alleged violations of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; (3) alleged violations of the Arkansas Religious Freedom Restoration Act ("ARFRA"), Ark. Code Ann. § 16-123-402 *et seq.*; and (4) alleged violations of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. Importantly, for purposes of evaluating these claims in light of Defendants' sovereign immunity as state actors, Rev. Brown only requests prospective injunctive relief, not money damages. Below the Court will analyze each of Rev. Brown's claims in turn, following a brief discussion of the legal standards the Court must consider when ruling on cross-motions for summary judgment.

## II.  LEGAL ANALYSIS

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).  The same standard applies where, as here, the parties have filed cross-motions for summary judgment.  When there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case."  *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).  Each motion should be reviewed in its own right, however, with each side

---

to the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. Amend. I.  With respect to this clause, "[t]he crucial word in the constitutional text is 'prohibit.' For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (internal quotation marks and citation omitted). For these reasons, the Court will not analyze Rev. Brown's First Amendment claim as a free exercise claim.

"entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also  Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998).  In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  DISCUSSION

### A.  First Amendment Violations and the Nature of the Forum at Issue

The crux of Rev. Brown's Complaint is that the DFA and Ms. Turner in her official capacity violated his First Amendment rights when they banned him from canvassing for signatures outside the Revenue Office, a place where he had solicited signatures for The Arkansas Medical Cannabis Act since March of 2014.  After receiving numerous complaints from Revenue Office patrons about Rev. Brown and other individuals who were soliciting signatures for different ballot initiatives, the DFA implemented a so-called statewide ban on all solicitation activities.  Although deemed "statewide" in name, the ban was not intended to apply to every revenue office in Arkansas, but rather would be implemented only at revenue offices located on private property, rather than offices located in city- or county-owned building or courthouses, or offices adjoining public sidewalks or town squares.

The new policy was not limited to soliciting signatures for ballot initiatives.  It also banned the solicitation of alms for the poor or for charity organizations, requests for

contributions for political causes, all campaigning activities by those seeking elected office, and all poll-taking and survey work.  *See* Doc. 60-1 (McHughes Aff.).  In banning these activities, the DFA reasoned that doing so reasonably furthered the interests of the State in promoting or improving the daily operation, maintenance, safety, and efficiency of the revenue offices, and the ban would only apply only to those revenue offices that were situated in non-public forums.

As discussed in greater detail below, the parties agree as to the location and ownership of the forum where Rev. Brown was collecting signatures.  They also agree that Rev. Brown, along with other individuals canvassing on behalf of different causes, collected signatures for ballot initiatives at this location for a number of years without facing any particular restriction on their activities.  Determining who is in the right in this dispute comes down to applying the undisputed facts about the nature of the forum to the relevant law surrounding acceptable limitations on otherwise constitutionally protected speech.  After all, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. and Educ. Fund*, Inc., 473 U.S. 788, 799 (1985).  "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Id.* at 799-800.

Evaluating the constitutionality of the statewide ban on solicitation activity at Arkansas' revenue offices requires a three-step process.  First, the Court must make a threshold determination as to whether the speech at issue in this case is of the kind and quality that is ordinarily granted protection pursuant to the First Amendment of the United

States Constitution.  *Cornelius*, 473 U.S. at 797.  Second, the Court must make a legal determination about the nature of the forum in question and the extent to which the government may limit access to that forum.  *Id.*  Third, the Court must examine whether justifications for excluding speech from the relevant forum satisfy the requisite standard and are otherwise reasonable.  *Id.*

Before taking up the three-part test, the Court notes that the First Amendment claim will only be addressed as to Defendant Turner, as the DFA is immune from suit with respect to this claim.  According to *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), "in the absence of consent, a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."  This means that the DFA, which has not consented to be sued, is subject to sovereign immunity.  Ms. Turner, however, does not enjoy the same immunity, since the Court in *Ex parte Young*, 209 U.S. 123 (1908), determined that a private party may seek injunctive relief in federal court against a state official, even if the State is otherwise protected by sovereign immunity.  *See Green v. Mansour*, 474 U.S. 64, 68 (1986).

## 1. Was Rev. Brown's Speech Deserving of First Amendment Protection?

In their Motion for Summary Judgment, Defendants argue that Rev. Brown's behavior toward patrons of the Revenue Office was "increasingly erratic and hostile," and that he became "aggressive and harassing" when patrons declined to sign his petition. (Doc. 20, p. 6).  As evidence of this, Defendants submitted police reports documenting patron complaints (Doc. 68-2),[5] as well as several affidavits (Docs. 19-1, 19-2, 19-3).  The

---

[5] As previously discussed, the affidavit of Sgt. Stout and supporting police reports that were originally attached to Defendants' Motion for Summary Judgment (Doc. 19-3) were

Court finds that after reviewing the police reports and affidavits, Rev. Brown's speech and behavior were constitutionally protected as a matter of law and did not rise to the level of fighting words or obscenity.

The Supreme Court in *Meyer v. Grant*,, unequivocally stated that "the solicitation of signatures for a petition involves protected speech . . . ."  486 U.S. 414, 422 n.5 (1988). The reasons why are simple to comprehend:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* at 421-22.

Although protecting this sort of speech is the general rule, there are certain circumstances when speech may be stripped of its protection, for example when speech qualifies as obscenity, defamation, or fighting words.  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384-86 (1992).  According to the Supreme Court in *Virginia v. Black*, "fighting words—'those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge , inherently likely to provoke violent reaction'—are generally proscribable under the First Amendment."  538 U.S. 343, 359 (2003) (quoting

---

essentially rescinded, and Sgt. Stout filed an amended affidavit and supporting police reports (Doc. 68-2), which are relied upon by the Court in surveying the body of police records applicable to complaints about Rev. Brown's conduct at the Revenue Office.

*Cohen v. California*, 403 U.S. 15, 20 (1971)).  Mere expressions of hostility will not rise to the level of fighting words, though, as a "true threat" of violence is one that "encompass[es] those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Id.*

The discussion in Defendants' Motion for Summary Judgment regarding whether Rev. Brown's speech and conduct merit constitutional protection is tellingly brief.  *See* (Doc. 20, p. 6).   Defendants are likely aware that courts are reluctant to classify speech as fighting words unless that speech is "likely to cause a breach of the peace," as opposed to being merely offensive to the listener.  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 573 (1942).  More recently, the Eighth Circuit has held that highly provocative and perhaps morally offensive words, which otherwise "fall short of refined social or political commentary," are nonetheless entitled to First Amendment protection when they bear some slight relationship to the exposition of ideas so as to "highlight . . . matters of public import."  *Phelps-Roper v. Koster*, 713 F.3d 942, 948 (8th Cir. 2013) (signs displayed by members of Westboro Baptist Church at funerals of soldiers, including "God Hates Fags," "Divorce Plus Remarriage Equals Adultery," "God Hates Adultery," "God Hates the USA," "Thank God for Dead Soldiers," "Priests Rape Boys," "Fags Doom Nations," and "9-11: Gift From God," found not to constitute fighting words).

As for the specific words and actions Rev. Brown used when soliciting at the Revenue Office, the 14 police reports about him provide little to no narrative detail concerning his actual speech and are instead quite conclusory, consisting mostly of terse descriptions or labels.  Even on summary judgment, Defendants have made no meaningful

12

attempt to flesh out the factual allegations in these reports so as to support an argument that Rev. Brown's speech is not of the constitutionally-protected variety.  The reports, even when read expansively, amount to complaints of "annoyance" due to Rev. Brown "harassing people" and being "offensive" and "really pushy," as well as "not taking no for an answer."   (Doc. 68-2).

As for the three affidavits attached to Defendants' Motion for Summary Judgment, two of them were submitted by employees of the Revenue Office and describe with some level of detail a number of incidents involving Rev. Brown.    The affidavit of Ms. Turner (Doc. 19-1) states that: (1) Revenue Office customers complained that Rev. Brown was "disorderly and harassing" when requesting signatures for his petition, and in April of 2014, a Revenue Office staff member "documented an incident where Rev. Brown allegedly told a woman 'he hoped she got cancer'"; (2) 44 customers complained about Rev. Brown between May 19, 2015, and August 3, 2015; (3), and Rev. Brown made it difficult to perform maintenance at the Revenue Office because he refused to move his table so landscapers could mow the lawn.  Unfortunately, the log of 44 complaints attached to Ms. Turner's affidavit provides no detail as to the nature of the complaints and only lists the name of each patron and the date of each complaint.

The Court disagrees that the words and actions of Rev. Brown that are mentioned in Ms. Turner's affidavit are such that they would be classified as fighting words not entitled to constitutional protection.  In any event, any dispute of fact as to these complaints must be resolved in Rev. Brown's favor, as he is the non-movant with respect to Defendants' Motion.

Moving on to the affidavit of Revenue Office employee Walter Anger (Doc. 19-2), he avers that he "personally received complaints that Rev. Brown has behaved in a harassing and aggressive manner toward customers who declined to sign his petition," including one complaint that Rev. Brown "shouted at a sixteen-year-old girl who would not sign his petition."

Aside from being hearsay, the Court finds that words and behavior described in Mr. Anger's affidavit provide insufficient detail for the Court to conclude they were "personally abusive" or "inherently likely to provoke violent reaction."   *Cohen*, 403 U.S. at 20.   Mr. Anger's affidavit does not describe fighting words or violent behavior, and for this reason, any dispute of fact as to nature of these words or actions must be resolved in Rev. Brown's favor.

Finally, Defendants have submitted the affidavit of Melissa Fults (Doc. 19-4), who is the Campaign Director and member of the Board for Arkansans for Compassionate Care, the organization that is sponsoring the medical marijuana ballot initiative for which Rev. Brown is soliciting signatures.  Ms. Fults attests that she received "several complaints that Rev. Brown became aggressive and harassing when Revenue Office customers declined to sign his petition," and as a result, her organization requested that Rev. Brown stop canvassing on behalf of the ballot initiative.   No further detail on the alleged aggressive and harassing speech by Rev. Brown is provided by Ms. Fults, and for the same reasons explained above, any material dispute of fact must be decided in Rev. Brown's favor.  Furthermore, regardless of whether Ms. Fults' organization endorses Rev. Brown's collection efforts or not, this issue is not before the Court to decide, and the

content and restrictions placed on his speech by the State—and Ms. Turner in particular—is the only issue of constitutional import.

One last point on the issue of the nature of Rev. Brown's speech must also be acknowledged.  There is no doubt that Rev. Brown feels passionately about the highly controversial topic of legalizing marijuana use, and he is convinced that unless he persuades other Arkansans to sign the ballot initiative so that the matter may be put to a public vote, he will never achieve his ultimate personal goal, which is to be permitted to use marijuana in his Rastafarian religious ceremonies.[6]  The nature of Rev. Brown's speech when he shares his political views with others and encourages them to sign this ballot initiative is what the First Amendment is intended to protect—even if the speech is perhaps overly strident when uttered.

For purposes of deciding summary judgment, then, the Court finds that insufficient detail has been provided by Defendants regarding why Mr. Brown's speech at the Revenue Office is not deserving of the constitutional protection ordinarily afforded to those who solicit signatures for a petition.  Rev. Brown contests that his speech was aggressive, violent, or harassing.  For the reasons explained above, the Court decides the first part of the three-part test in Rev. Brown's favor.

## 2. Was the Revenue Office a Public, Designated-Public, or Non-Public Forum?

The second part of the three-part test asks whether Rev. Brown's speech was delivered in a traditional public forum, a non-traditional forum that was designated by the government as public, or a non-public forum.   When questioned about whether the State

---

[6] The Court does not question the sincerity or depths of Rev. Brown's beliefs, which are well-known to this Court.  *U.S. v. Brown*, 72 F.3d 134 (8th Cir. 1995), *U.S. v. Brown*, 2007 WL 2746608 (W.D. Ark. 9-18-07).

could ever lawfully limit constitutionally protected speech, depending on where the speech was delivered, Rev. Brown stated:  "If the Court admits that the speech is protected, the location where the speech occurs is irrelevant."  This, however, is not the law.

The Supreme Court in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.* explained that the government, like a private owner of property, "has power to preserve the property under its control for the use to which it is lawfully dedicated . . . ."  473 U.S. at 800 (quotation and citation omitted).  That power is not unfettered, of course, and "the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes."  *Id.*  The place where speech occurs, therefore, is not "irrelevant," as Rev. Brown maintains, but critical to the analysis, as the extent to which the government can exert control over the right to free speech "depends on the nature of the relevant forum."  *Id.*

First, it is clear that, due to the location and ownership of the space where Rev. Brown performed his solicitation activities, it was not a traditional public forum. Such are found on city streets, public sidewalks, and in public parks, as these places have been associated historically with expressive activity.  *See United States v. Grace*, 461 U.S. 171, 177 (1983).  A traditional public forum is defined by the objective characteristics of the property, such as whether, "by long tradition or by government fiat," the property has been "devoted to assembly and debate."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

16

Turning to those objective characteristics, the place where Rev. Brown solicited signatures was directly in front of the Revenue Office building, facing the parking lot, in a grassy area under a tree, immediately adjacent to an approximately 30-foot concrete sidewalk that permitted ingress and egress to the building through the front door.   The parties agree as to where Rev. Brown solicited signatures, as evidenced by his testimony in his deposition and a hand-drawn map Rev. Brown prepared during the deposition, which is a part of the summary judgment record.   *See* Doc. 60-3 (Brown Dep.).



*See*, collectively, Doc. 60-2 at p. 4 and Doc. 60-3 at p. 9.

The 30-foot sidewalk leading from the parking lot to the front door is not a public sidewalk, and the grassy area where Rev. Brown set up his table, as well as the building's parking

lot—which is intended only for the use of Revenue Office patrons and is not a public lot—are on private property leased by the State from a third party. *See* Doc. 60-2 (Turner Aff.). By contrast, the public sidewalk running along Razorback Road is completely separate from the Revenue Office property. *Id.* That property is to the west of Razorback Road, connected to the main thoroughfare by a short driveway. *Id.*

Rev. Brown provides no proof to counter Defendants' proof—and in fact did not disagree when questioned directly by the Court at the summary judgment hearing—that the place where he solicited signatures is, in fact, not located on a public sidewalk, on a city street, in a public park, or on government-owned property. On summary judgment, when a movant presents sworn testimony in the form of an affidavit as to particular facts, the non-movant must meet proof with proof. Fed. R. Civ. P. 56(e). Here, the undisputed facts as to the objective characteristics of the property in question indicate that it is not a traditional public forum.

The next forum category is the designated public forum. This is "property which the state has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 46. Once the government "has intentionally designated a place or means of communication as a public forum, speakers cannot be excluded without a compelling governmental interest." *Cornelius*, 473 U.S. at 800. Here, Rev. Brown maintains that the Revenue Office transformed its otherwise non-public grounds into a designated public forum when it permitted persons like Rev. Brown to conduct solicitation activities there.

The counter-argument to Rev. Brown's is found in the Supreme Court case of *United States v. Kokinda*, 497 U.S. 720, 730 (1990), in which the Court held that a postal

sidewalk was not a traditional public forum, nor had the Postal Service dedicated the sidewalk to the public for expressive activity, regardless of the fact that "individuals or groups [had] been permitted to leaflet, speak, and picket on postal premises."  The *Kokinda* Court explained that "a practice of allowing some speech activities on postal property do[es] not add up to the dedication of postal property to speech activities."  *Id.* This is because "'[t]he government does not create a public forum by . . . *permitting* limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802). The "intention" of the government body, therefore, in allowing discourse in a nontraditional forum is analyzed rather pragmatically.

In *Kokinda*, the Court determined that the Postal Service's sidewalk—much like the 30-foot walkway leading from the parking lot to the front door of the Revenue office—was not a public passageway "where people [could] enjoy the open air or the company of friends and neighbors in a relaxed environment," *id.* at 727 (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981)), but rather "was constructed solely to provide for the passage of individuals engaged in postal business," *id.* at 727.

Moreover, the *Kokinda* Court found that the Postal Service had not expressly dedicated its sidewalks to First Amendment activity, despite permitting groups to speak and picket there.  The Court explained that "postal property is expressly dedicated to only one means of communication:  the posting of public notices on designated bulletin boards," as evidenced by federal regulations specific to the Postal Service.  *Id.* at 730.  Similarly, in the case at bar, the purpose of a revenue office is to conduct the business of the State by providing its citizens with a location to adhere to licensing and vehicle registration

requirements, and also tax laws.  *See* Doc. 19-2 (Anger Aff.).  The Court therefore concludes that revenue offices are not expressly dedicated to First Amendment activity, despite the fact that certain activity, namely the solicitation of signatures for ballot initiatives, was permitted to occur on revenue office property for some period of time.  *Cf. Cornelius*, 473 U.S. at 804 ("In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum."); *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.").

Since the Court has now determined that the Revenue Office grounds are neither a traditional public forum nor a designated public forum, the correct categorization of the grounds is that of a non-public forum.  In a non-public forum, the government "does not have to demonstrate that the regulation is narrowly tailored to the government interest it seeks to achieve."  *Initiative and Referendum Inst. v. U.S. Postal Serv.*, 741 F. Supp. 2d 27, 39 (D.D.C. 2010) (citing *Lee*, 505 U.S. at 683).  Instead, a minimal level of scrutiny applies, and the restriction must only be "reasonable and 'not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Kokinda*, 497 U.S. at 730 (quoting *Perry*, 460 U.S. at 46).  This brings the Court to the third part of the analysis:  the reasonability of the restrictions on solicitation activity at revenue offices.

### 3. Was the Restriction on Speech Both Viewpoint-Neutral and Reasonable in Light of the Nature of the Forum?

As explained previously, "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. "Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* at 809.

In the instant matter, the reasonableness of the policy banning solicitation at revenue offices must be evaluated "in the light of the purpose of the forum and all the surrounding circumstances." *Id.* As discussed, the purpose of revenue offices is to assist the public in paying taxes, registering vehicles, and obtaining proper licensing. When patrons arrive at the Revenue Office to conduct business, they ordinarily park and cross the small parking lot off Razorback Road and proceed immediately down a relatively short, straight, concrete path directly to the front door. The only other open space on the grounds aside from the parking lot is a grassy area with a pear tree just beside the path and facing the parking lot. As Defendants have explained in their briefing, the reason why the solicitation ban was implemented was to promote the daily operation, management, maintenance, safety, and efficiency of the facilities. (Doc. 60-1). These justifications are reasonable, particularly in light of the fact that the volume of complaints that patrons made to the Revenue Office and to police regarding solicitation activity indicates that such activity

is at least disruptive to the regular business of the Revenue Office, if not to the business of other revenue offices statewide.

The policy is reasonably tailored, as well, as it will not apply to more than half the revenue offices in the State due to the nature of the forums associated with those offices. The solicitation ban will only be enforced at 57 of the 134 revenue offices across the State. Marla McHughes, the Administrator of State Revenue Offices for Arkansas, explains in her affidavit that her agency will not enforce the policy at 77 of the revenue offices "because they are inside, or flanked by, traditional public forums and/or areas not controlled by the Department of Finance and Administration." (Doc. 60-1, p. 2). Specifically, 17 revenue offices are located in county courthouses, 25 are in city- or county-owned buildings, 6 are in town squares, and 29 are bordered by public sidewalks. *Id.* Defendants intend to enforce the solicitation ban only at revenue offices that qualify as non-public forums, such as the one in Fayetteville.

Next, the Court finds that the policy itself does not target any particular speech or viewpoint but instead bans all solicitation activity across the board. Although Rev. Brown argues that Defendants are actually pursuing an agenda against him personally and the ballot initiative he sponsors, he submits no evidence to support this belief, and the belief is flatly countered by the affidavit of Ms. Turner. *See* Doc. 60-2 ("I have no bias against Arkansans for Compassionate Care or the medical marijuana ballot initiative."). Moreover, the evidence of record establishes that other individuals besides Rev. Brown solicited signatures at the Revenue Office for ballot initiatives other than the medical marijuana initiative, and patrons made complaints about those individuals, as well. The policy banning solicitations, if prompted by these sorts of complaints, is clearly not directed to

22

Rev. Brown or his political cause but is a facially neutral way for the State to limit the disruptive behavior of all persons who have in the past solicited on private property leased by the State.

As the ban is reasonably designed to promote the normal business activities of the State's revenue offices and is viewpoint-neutral, the Court finds that the ban does not violate Rev. Brown's constitutional rights. The ban does not prevent Rev. Brown from canvassing in other public forums, such as on city sidewalks, in plazas, or in parks. Similarly, Rev. Brown is still free to express to others his ideas about marijuana use, his religious faith, and the benefits of signing the ballot initiative he supports.

For all of these reasons, the Court dismisses with prejudice Rev. Brown's First Amendment Claim against Ms. Turner.[7]

---

[7] With respect to Rev. Brown's argument, made in a Pretrial Memorandum (Doc. 34) submitted by his former counsel on December 3, 2015, that the solicitation ban failed to comply with the Arkansas Administrative Procedures Act ("APA"), the Court observes that under the APA, each agency must "[m]ake available for public inspection all rules and all other written statements of policy or interpretations formulated, adopted, or used by the agency in the discharge of its functions." Ark. Code Ann. § 25-15-203(a)(3). The APA defines the term "rule" as "an agency statement of general applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice of an agency and includes, but is not limited to, the amendment or repeal of a prior rule." Ark. Code Ann. § 25-15-202(9)(A). "Rule" does not mean "[s]tatements concerning the internal management of an agency and that do not affect the private rights or procedures available to the public." Ark. Code Ann. § 25-15-203(9)(B)(i). Second, unless and until a rule has been filed with the Secretary of State and made available for public inspection, it is not valid or effective against any person, and it may not be invoked by the state agency for any purpose. *See* Ark. Code Ann. § 25-15-203(b).

In interpreting what constitutes a "rule" under the APA, the Arkansas Supreme Court has held that where an agency's action is "no more than the carrying out of legislatively mandated administrative duties," it will not be considered an adoption of a "rule" within the meaning of the APA. *Eldridge v. Bd. of Corr.*, 768 S.W.2d 534, 536 (Ark. 1989); *see also Ark. Pharmacist's Ass'n, Inc. v. Ark. State & Pub. Sch. Life & Health Ins. Bd.*, 98 S.W.3d 27, 30 (Ark. 2003). Further, it is clear that a state agency can carry out its statutorily appointed

## B.  RFRA and ARFRA Claims

In *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997), the Supreme Court held that RFRA exceeded Congress' powers under the Fourteenth Amendment and was unconstitutional as applied to the states.  For this reason alone, Rev. Brown's RFRA claim is dismissed as to both Defendants, one of which is a state agency, and the other is a state employee sued in her official capacity.

Moreover, the Court finds that "[t]o state a claim under RFRA, a religious objector must show that the government substantially burdens a sincere religious exercise or belief." *Sharpe Holdings, Inc. v. United States Dept. of Health and Human Servs.*, 801 F.3d 927, 937 (8th Cir. 2015).  Even if a RFRA claim could have been brought against these Defendants, Rev. Brown failed to show that the ban on solicitations activity at state revenue offices substantially burdens his sincere religious exercise or belief.  He is still free to practice his religion in places other than the Revenue Office, and the Court rejects the notion that being banned from collecting signatures for a ballot initiative in certain locations in Arkansas would somehow impinge on his sincerely held religious beliefs or his ability to practice his religion.

This same reasoning applies to justify dismissal with prejudice of Rev. Brown's ARFRA claim, which is never well explained in the pleadings.  There are no Arkansas appellate cases or Attorney General Opinions interpreting the ARFRA that the Court has been able to locate; however, assuming an ARFRA claim would be treated in much the

---

day-to-day tasks without every action being considered an exercise in "rule making."  *Ark. Pharmacist's Ass'n, Inc.*, 98 S.W.3d at 31.  Here, the policy does not meet the APA's definition of a "rule" because it simply prohibits those who do not have business with the State from soliciting on revenue office property.

same way as a RFRA claim, it is decided as a matter of law in Defendants' favor for the reasons previously explained.

### C.  Voting Rights Act Claims

Again setting aside the issue of whether Defendants are subject to suit under the Voting Rights Act, Rev. Brown has failed to establish any facts that would indicate that his rights were violated under the Act.  As discussed previously, the ban on solicitation in revenue offices is reasonable, viewpoint neutral, and does not violate Rev. Brown's constitutional rights under the First Amendment.  Neither is his right to vote, nor the right of any other individual, being compromised by virtue of the ban on solicitations at revenue offices.  Rev. Brown explained at the hearing that his Voting Rights Act claim proceeds from the fact that he often encounters people who do not think they should sign his ballot initiative because they are convicted felons, and as such, are prohibited from being registered voters.  Rev. Brown takes the opportunity to educate such persons about their rights and sometimes fills out voter registration paperwork on their behalf—right at his table in the grassy area in front of the Revenue Office.  He contends that this work of educating felons, whom he claims are mostly racial minorities, about their right to vote will be burdened if he is no longer able to solicit ballot initiative signatures at the Revenue Office.

This argument by Rev. Brown, though novel and potentially suggestive of some other civil rights claim, does not support a claim for a violation of the Voting Rights Act, which was enacted in 1965 to address racial discrimination in the voting context.  Banning solicitation activity at the Revenue Office does not impinge upon Rev. Brown's ability to continue to educate former felons about their voting rights or to help them fill out voter

registration paperwork.  Despite the ban, anyone can still enter the Revenue Office and register to vote.  This claim is without merit and is dismissed with prejudice.

## IV.  CONCLUSION

For the reasons explained above, Defendants' Motion for Summary Judgment (Doc. 19) is **GRANTED**, and Rev. Brown's Motion for Summary Judgment (Doc. 47) is **DENIED**.

**IT IS THEREFORE ORDERED** that all claims against both Defendants are **DISMISSED WITH PREJUDICE**, and the Court will issue a Judgment today.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Transcript of Deposition (Doc. 53) is **DENIED AS MOOT**, and Defendants' Motion for Sanctions Under Rule 11 (Doc. 55) is **DENIED**.

**IT IS SO ORDERED** on this 8th day of April, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

26